

**SIGNED this 14 day of March, 2007.**

_____
**JOHN T. LANEY, III**
**UNITED STATES BANKRUPTCY JUDGE**
_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF GEORGIA
### VALDOSTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| ROSEMARY DOUGLAS | : | CASE NO. 05-70649 JTL |
| | : | CHAPTER 7 |
| Debtor**.** | : | |
| _____ | : | |
| | : | |
| ROSEMARY DOUGLAS | : | |
| | : | |
| Plaintiff, | : | A.P. NO. 05-7021 |
| | : | |
| vs. | : | |
| | : | A.P. NO. 05-7022 |
| EDUCATIONAL CREDIT MANAGEMENT CORP. | : | |
| | : | |
| Defendant, | : | |
| | : | |
| UNITED STATES OF AMERICA on behalf of | : | |
| UNITED STATES DEPARTMENT OF EDUCATION | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OPINION

This matter is before the Court on complaint of Debtor, Rosemary Douglas, to determine the

dischargeability of various student loans.  On June 28, 2006, the Court held a bench trial of the issues

presented.  The Court heard evidence and argument from counsel for Debtor and counsel for the two

Defendants to the complaint.  Following the hearing, the Court took the matter under advisement,

inviting counsel for each party to submit briefs.  Defendant Educational Credit Management Corp.

("ECMC") submitted its brief to the Court on July 14, 2006.  No other briefs were filed with the

Court.  The issue for the Court to decide is whether Debtor's repayment of her student loan debt

would impose an "undue hardship" upon Debtor and Debtor's son as that term is used in 11 U.S.C. §

523(a)(8).[1]  The Court, having carefully considered the evidence presented at the hearing, the

argument of counsel, the brief submitted, and the applicable statutory and case law, holds that,

consistent with the reasoning set forth below, excepting Debtor's student loan debt from discharge

would impose an undue hardship upon Debtor and her dependent son.


## FINDINGS OF FACT

At the June 28, 2006 trial, the parties presented the Court with a stipulation of facts.  The

Court adopts those stipulations as part of its findings.  The Court will make other findings in

accordance with evidence presented at trial.

### A.    *Findings by Stipulation*

Defendant ECMC is the holder of nineteen consolidated, guaranteed student loans of Debtor.

Those loans are educational loans made, insured, or guaranteed by a governmental unit as described

---

[1] Further reference to provisions of the Bankruptcy Code will be made only to the section number of the provision.  It should be assumed that statutory references are to the Bankruptcy Code found at Title 11 of the United States Code unless otherwise indicated.

in § 523(a)(8). The total amount disbursed on the loans held by ECMC was $26,120.00. As of July 10, 2005, the total amount owed by Debtor on ECMC's nineteen loans was $59,857.36. The longest foreseeable time period for repayment of ECMC's loans is 300 months.

Defendant United States of America on behalf of the U.S. Department of Education ("DOE") is the holder of thirteen consolidated, guaranteed student loans. These loans are also educational loans made, insured, or guaranteed by a governmental unit as described in § 523(a)(8). The total amount disbursed on the loans held by the DOE was $21,998.00. As of June 15, 2006, the total amount owed by Debtor on the DOE's thirteen loans was $30,726.85.

Debtor is qualified and eligible for the William D. Ford Repayment Program ("Ford Program"), through which Debtor can consolidate the student loans at issue and service her total debt with a single monthly payment. Debtor has been advised that she is qualified for the Ford Program. Congress created the Ford Program in 1993. The Ford Program is administered by the DOE.

The Ford Program offers four different repayment options: (1) Standard; (2) Extended; (3) Graduated; and (4) Income Contingent. The terms and conditions of the four repayment options are set forth in the Code of Federal Regulations at 34 C.F.R. § 685.208 through 685.210. A party participating in the Ford Program may change from one repayment option to another at any time. Table 1 summarizes the term of each repayment option and the payment Debtor would be required to make on the loans held by ECMC.

**TABLE 1—ECMC Loans**

| Repayment Plan | Term (Months) | Initial Monthly Payment | Total Payments (Interest + Principle) |
|---|---|---|---|
| Standard | 120 | $679.68 | $81,561.60 |
| Extended | 300 | $404.17 | $121,251.00 |
| Graduated | 300 | $339.84 | $129,382.90 |
| Income Contingent | 300 | Based on Income | Based on Income |

3

The term of each repayment option and each option's corresponding payment for the loans held by

the DOE are set forth below in Table 2.

**TABLE 2—DOE Loans**

| Repayment Plan | Term (Months) | Initial Monthly Payment | Total Payments (Interest + Principle) |
|---|---|---|---|
| Standard | 120 | $268.74 | $32,248.80 |
| Extended | 240 | $174.58 | $41,899.20 |
| Graduated[2] | 240 | $134.37 | $44,927.28 |
| Income Contingent[3] | 300 | Based on Income | Based on Income |

Debtor could elect to combine the payments and make a single payment to the Ford Program to

service both the ECMC and the DOE loans.  Under the Graduated option, the payments would

gradually increase for each debt every two years during the repayment period.

Under the Income Contingent Repayment Plan ("ICRP") option, the monthly payment is

calculated based upon the borrower's adjusted gross income and family size.  The monthly payment

amount is calculated in one of two ways: (1) the amount that would be paid if the borrower repaid

the loan in 300 months, multiplied by an adjusted gross income minus the poverty level for the

borrower's family size; or (2) 20% of the borrower's "discretionary income," which is defined as the

borrower's adjusted gross income minus the poverty level for the borrower's family size.  If the

calculation yields a monthly payment between $0.00 and $5.00, the monthly payment is $5.00, unless

the borrower's income is less than or equal to the poverty level for borrower's family size, in which

case the payment would be $0.00.  If the monthly payment is less than the amount of the interest that

accrues on the loans, the interest is capitalized, *i.e.*, added to the principal, once per year until the

---

[2] According to the parties' stipulation, this is an estimated monthly repayment amount for the first two months of the term and based upon total loan repayment.  The monthly payment amount will generally increase every two years, based on the graduation factor in the graduated repayment rules.

[3] The parties' stipulation provides that the payment under the "Income Contingent" option will be calculated annually and is subject to change based on the poverty guidelines for family size as determined by the U.S.

principal balance reaches 10% more than the original principal balance.[4]  At that point, interest continues to accrue but is not added to the principal balance.  Under the ICRP, the repayment period for Debtor would be 300 months, at the end of which the entire debt would be cancelled.  The parties stipulate that payments under the ICRP can never exceed 20% of the borrower's discretionary income, which is defined above.

The parties stipulate and agree that Debtor's student loans held by the DOE can be consolidated under the Ford Program along with those held by ECMC and that there are no obstacles to such consolidation.[5]  Payment amounts under the ICRP can be determined using a loan calculator currently available at the following web address:

www.ed.gov/offices/OSFAP/DirectLoan?RepayCalc/form2.html.

Debtor's family is composed of two people, Debtor and Debtor's minor child.  The poverty level for a family of two was $12,830.00 in 2005 and $13,200.00 in 2006.  The applicable poverty level is that determined and published by the U.S. Department of Health and Human Services.[6]

In addition to the four different types of repayment options, Debtor may seek deferment of repayment or forbearance under the Ford Program.  A deferment or postponement of payments may be granted where a borrower is conscientiously seeking, but unable to find, full-time employment (for up to three years) or where a borrower is experiencing an economic hardship as defined by federal law (also for up to three years).

Forbearance allows a borrower to stop or reduce monthly payments for a limited, specific period, during which time interest on the loans accrues.  If the interest is not paid, it is added to the

---

Department of Health and Human Services.  The Income Contingent option has a maximum term of 25 years.
[4] Stipulation at ¶ 8(d) (citing 34 C.F.R. § 685.209).

[5] *Id*. at ¶ 10 (citing 34 C.F.R. 685.220).

[6] *Id*. at ¶ 12 (citing Vol. 69, Fed. Reg. No. 30, pp. 7336-38; Vol. 70, Fed. Reg. No. 33, Feb. 18, 2005, pp. 8373-75;

principal balance. Forbearance may be granted based upon a borrower's poor health, temporary financial hardship, or if the borrower is obligated to make payments on federal student loans that are equal to or greater than 20% of monthly gross income or for other reasons acceptable to the DOE.[7] To the best of Debtor's knowledge, she would be eligible and qualified for forbearance or deferment once she is accepted into the Ford Program.[8]

B.     *Findings From Evidence Presented at Trial*

When Debtor was 15 or 16 years old she lived with her father in Madison, Florida. While living in Madison, Debtor was involved in an abusive relationship with an older man. The man abused Debtor on almost a daily basis. One evening, following a high school football game, Debtor walked with a group of people to a friend's house. Debtor's boyfriend followed the group in his car. To avoid the man, the group walked to a friend's older sister's house, believing the man would not bother them there. The man kept driving by the house of the friend's older sister. Debtor decided that for safety sake, she needed to make her way home. Before leaving the older sister's house, Debtor went into the kitchen and armed herself with a knife. While walking down the older sister's driveway, Debtor was attacked by her boyfriend who threw her to the ground. Debtor swung the knife at the man and in the process cut him in the groin area. The man died later from his injury. Debtor was retained in a youth detention center.

Debtor was prosecuted for the man's death. She pled guilty to a lesser charge of manslaughter and served one year and one week in prison. Debtor's conviction does appear on her criminal record. While in prison, Debtor received her GED. After Debtor was released, she attended Abraham Baldwin Agricultural College ("ABAC") in 1991. Later, she applied and was accepted to

---

Vol. 71, Fed. Reg. No. 15, Jan. 24, 2006, pp. 3848-49).

[7] *Id*. at ¶ 15 (citing 35 C.F.R. § 685.205).

Valdosta State University ("VSU"). While attending VSU, Debtor studied early childhood education and upon completing her studies received a degree in the same in 1994.

Debtor sat for the Georgia Teacher Certification Test in 1994 and received her certificate to teach in January of 1995. The certificate expired in 1999 and Debtor did not seek a continuance of her certification or reinstatement. In May of 2005, Debtor applied to have her certification reinstated, but has not been notified of whether her application will be granted. While certified, Debtor applied for teaching positions with the Valdosta City School System, the Cook County School System, and the Georgia state prison system. Debtor was not hired. It was the unchallenged testimony of Debtor that she was told by the Valdosta City School System that she was not being hired because her felony conviction made her too much of a liability when it came to working with children. The Cook County School System told Debtor the same. Debtor has worked only as a substitute teacher at Valdosta City and Lowndes County schools, but Debtor testified that she can no longer substitute because of her criminal conviction. The Georgia Professional Standards Commission took no negative action against Debtor while she was certified to teach.[9] Debtor testified that simply because a person has a teaching certificate does not guarantee that person a teaching position.

Debtor testified that when it became apparent that she would not be able to find a teaching position, she decided to return to school. Beginning in the winter quarter of 1995, Debtor enrolled in a number of business administration classes. Debtor took business classes at VSU until 1997 when she became pregnant and was diagnosed with HIV, which is discussed below. Debtor financed her

---

[8] *Id*. at ¶ 16 (citing 34 C.F.R. § 685.204; 34 C.F.R. § 685.205).

[9] The Georgia Professional Standards Commission regulates the teaching profession in Georgia. The Commission issues teaching certificates in the state.

business courses through loans made by the DOE. Debtor withdrew from at least some of the business courses she had enrolled in after disbursements on the DOE student loans had been made. Debtor testified that the monies disbursed under the DOE loans were used for class related expenses such as tuition and books.

Debtor attributes her inability to find a teaching position to her felony conviction. Debtor also believes that because of her conviction, her teaching certification is not likely to be reissued. Debtor states that she was never advised that her felony conviction would make finding a teaching position so difficult. As recently as two months prior to the hearing, Debtor testified that some official associated with the issuance of teaching certificates told Debtor that the felony conviction should have been addressed when she first applied to be certified to teach. Debtor testified that the felony conviction is not so much of an issue with lower paying positions, but is for higher paying jobs.

Debtor presently raises her 9-year-old son as a single parent. Debtor is 45 years old. Debtor was married in 1992 or 1993, but officially divorced in 2004. Debtor has received $308.00 per month in child support from her son's father since 1997. Debtor's son's father also provides partial health insurance for the child. While pregnant with her son in 1995, Debtor was diagnosed with HIV, which requires Debtor to undergo medical testing every three months. Since her diagnosis, Debtor's illness has escalated to the status of AIDS, but since taking medication, the illness has remitted back to the status of HIV only. Debtor's most recent set of tests cost Debtor $770.00. Debtor is personally responsible for the cost of the quarterly tests and must pay for the tests in installments. Debtor has no health insurance. Debtor does have the benefit of a government drug program through which she receives her needed medicines with no co-payment. Debtor's son also

8

participates in a government drug program, but Debtor is required to pay a small co-payment on drugs purchased for her son.  The drug program Debtor participates in does not assist Debtor in paying for other medical expenses such as doctor's visits or the medical tests required by her health condition.  Shortly after being diagnosed with HIV, Debtor applied for Social Security Insurance benefits but was denied.  Debtor testified that if asked by a potential employer about her illness she would respond truthfully.  Debtor believes that her illness would be a factor in her securing another position.

Since 2003, Debtor has been employed as a receptionist at the Quality Inn.  Debtor presently works an average of 32 hours per week.  Debtor testified that to work more hours would cause her to incur childcare expenses for her son, resulting in a reduction of her net income.  Debtor's net monthly income is approximately $1,332.00 including the $308.00 received each month in child support.  Debtor's Schedule J indicated that her monthly expenditures totaled $1,157.00, including $450.00 per month in rent, a lean $200.00 per month food allowance, and $48.00 per month for cable.  Debtor's cable cost includes service to a cable modem connected to Debtor's son's computer. The computer was given to Debtor's son by his father.  Debtor's son uses the cable connection to access the Internet for school-related purposes and for his entertainment.  Debtor stated that she did not use the computer and that the computer was located in her son's room.

Despite Debtor's Schedule J, she testified at trial that her *actual* monthly expenses currently total approximately $1,600.00.[10]  Debtor testified that her monthly electricity bill is usually around $85.00, a reduction from the $125.00 per month given in her schedules.  Debtor testified that she is extremely conservative with her use of electricity in order to keep the cost down.  Regarding

---

[10] The Court's addition of the expenses testified to at trial yields a total of $1,678.00.

increases in her monthly expenses, Debtor testified that her monthly water and sewage expense is generally $46.00 to $49.00, costs for food are actually $340.00 to $350.00 per month, clothing expenses are usually $100.00 to $125.00 (Debtor stated that this money was spent on her son and not on her self), laundry and dry cleaning generally cost around $50.00, and transportation (gas and maintenance) generally cost approximately $140.00. Debtor testified that during some months, she must borrow food from friends in order to feed her and her son. The largest adjustment to her account of monthly expenses was for medical and dental expenses. Because of the quarterly testing required by her HIV condition, Debtor's medical expenses, when the costs are broken down per month, are approximately $300.00. Debtor also testified that an additional $10.00 or $11.00 per month is generally spent for Debtor's son's extracurricular activities, including school field trips and participation in the school chorus. Accounting for the increases to expenses testified to by Debtor at the trial, Debtor's monthly expenses exceed her net monthly income by approximately $346.00.

Debtor does not have a cellular phone. Debtor drives a 1991 Oldsmobile Cutlass Sierra automobile that is paid for. Debtor does not have renter's insurance. Debtor testified that she could not afford even the smallest of additional expenses. Debtor does not have money saved should an emergency arise. When emergency expenses do arise, Debtor testified that she must cut from other categories of spending in order to cover the expense. Regarding her transportation expense and vehicle, Debtor testified that she will drive her vehicle until she has a blow-out before replacing the tires and that when she does replace the tires on her vehicle it is usually one or two tires at a time.

Debtor's income history is reflected below in Table 3.

### TABLE 3—Debtor's Income History

| Tax Year | Adjusted Gross Income |
|----------|----------------------|
| 1999 | $4,919.00 |
| 2000 | $8,540.00 |

| 2001 | $16,065.00 |
| 2002 | $16,503.00 |
| 2003 | $7,059.00[11] |
| 2004 | $12,519.00 |
| 2005 | $13,370.56 |

As mentioned above, Debtor has worked at the Quality Inn as a receptionist since 2003 and works an average of 32 hours per week. Prior to working at the Quality Inn, Debtor worked at the Belks Department Store as a customer service representative. The position at Belks required Debtor to stand a majority of the time she worked. At some point, Debtor developed a back condition, which required surgery in 2003. Following the surgery, Debtor could no longer work in a position requiring her to stand for extended periods of time, so she resigned her position at Belks. She remained unemployed for a period of 8 to 9 months before becoming a receptionist at the Quality Inn.

The debt represented by ECMC's nineteen consolidated guaranteed student loans was incurred by Debtor as she pursued her degree in early childhood education at VSU from 1991 to 1994. Debtor incurred the debt represented by the DOE's thirteen consolidated guaranteed student loans as she pursued studies in business administration at VSU from 1995 to 1997. Debtor testified that she made a very small number of voluntary payments toward her ECMC student loans in 2001. Debtor mailed those payments, which she believes were from $40.00 to $60.00 per month, to NCO Financial Services at an address in Philadelphia, Pennsylvania. Debtor made no *voluntary* payments toward her DOE loans. Debtor defaulted on both her ECMC and her DOE loans. Following default, *involuntary* payments were made toward Debtor's DOE loans via two wage garnishment payments

---

[11] Debtor testified that the reason for the low income in 2003 was that she was unemployed for 8 to 9 months following back surgery.

and four treasury offsets against Debtor's federal income tax refunds.  Total *involuntary* payments to the DOE on its loans totaled over $4,000.00.

Debtor testified that she filed her tax returns each year following her default knowing that any refund she would be entitled to would be seized and paid toward her student loans.  Debtor stated that filing her tax returns each year, despite knowing any refund would be seized, was her way of paying something towards her student loans.  Debtor testified that the treasury offset provided a larger payment toward the loans than she could have afforded to pay out of her pocket during the year.  Rather than the treasury offset, Debtor testified that she probably could have paid $10.00 to $15.00 per month.

Once the wage garnishments began, Debtor testified that she contacted the garnishor asking if there were other options for repayment available to her.  It was the unchallenged testimony of Debtor that she was told there was no other option available other than the monthly payment of 20-25% of her gross income.

A witness for the DOE testified that upon default, borrowers are sent an initial notice of default.  If the borrower does not respond to that initial notice, a second notice of default is sent which addresses the rehabilitation of the borrower's loans and consolidation.  The DOE would have sent thirteen notices to Debtor on account of her thirteen loans with the Department.

Debtor did not contact the DOE after the notices were sent and Debtor's loans were transferred to the DOE's collection department.   Debtor never undertook to rehabilitate or consolidate her DOE loans.  The representative from the DOE testified that borrowers in default are sent letters from time to time outlining various repayments options and programs like the Ford

program, but the witness had no personal knowledge of whether such a letter was sent specifically to Debtor.

Debtor testified that the first time she learned of alternative methods for paying either her ECMC or DOE loans was after this adversary proceeding was filed. Debtor stated she learned of the Ford Program from her attorney who relayed the information to Debtor from a letter dated September 2, 2005, sent by counsel for ECMC. Debtor stated that she had requested deferment of all of her student loans while she was in school and that in 2002 or 2003 she received a letter stating that she was in default. Debtor also testified that the letter offered consolidation as an option. Debtor did not state whether the letter was sent by ECMC or the DOE or which entity's loans the letter addressed. There is no dispute that Debtor was in default of her loan payments to both ECMC and the DOE.

On September 15, 2005, Debtor submitted to the DOE a "Loan Discharge Application" based upon alleged false certification by VSU despite a disqualifying status (*i.e.*, Debtor's criminal conviction). In that application, Debtor alleged that at the time VSU certified or originated her loans, she was unable to meet the "legal requirements for employment" as a teacher in Georgia because of her criminal record.[12] Although called for in the application, Debtor did not provide any information regarding Georgia's legal requirements for employment that would have disqualified her from being hired in the state as a teacher.[13] Debtor attached a report of the incident in Florida but nothing else. By letter dated September 21, 2005, the DOE acknowledged its receipt of Debtor's loan discharge application and stated that Debtor had not established that VSU falsely certified Debtor's eligibility to borrow and that Debtor had not provided proof that Georgia's legal requirements barred Debtor's

---

[12] Debtor's Loan Discharge Application at 1 (ECMC's Exhibit 11).

[13] *Id.*

13

employment as a teacher.  Debtor did not challenge this decision and did not send in information

supporting her contention.

After learning of the various repayment options through counsel for ECMC, Debtor has not

looked further into payment under the Ford Program.  She testified that she could not afford any

payment, no matter how small the amount.  Under the ICRP of the Ford Program, Debtor would have

to apply annually to qualify.  Debtor testified that she could not afford the basic expenses associated

with making that annual application (*i.e.*, postage, paper, etc.).

## DISCUSSION AND CONCLUSIONS OF LAW

Discharging student loan debt in bankruptcy is a difficult proposition and requires a finding

of extreme circumstance by the court.  Section 523(a)(8) of the Federal Bankruptcy Code ("Code")

provides that an educational loan is not dischargeable in bankruptcy "unless excepting such debt

from discharge . . . would impose an *undue hardship* on the debtor and the debtor's dependents."[14]

The term "undue hardship," is not defined in the Code.  The term, therefore, has been considered by

many courts across the nation with two primary standards emerging: the totality of the circumstances

test and the *Brunner* test.  The *Brunner* test, which was originally articulated by the Second Circuit

Court of Appeals in 1987, provides that proving undue hardship requires a three-part showing:  (1)

the debtor cannot maintain, based on current income and expenses, a *minimal* standard of living for

herself and her dependents if forced to repay the loans; (2) additional circumstances exist indicating

that this state of affairs is likely to persist for a significant portion of the repayment period of the

student loans; and (3) the debtor has made good faith efforts to repay the loans.[15]

---

[14] 11 U.S.C. § 523(a)(8) (2006).

[15] Brunner v. New York State Higher Educ. Serv's. Corp. (*In re* Brunner), 831 F.2d 395, 396 (2nd Cir. 1987).

In the 2003 case of *Hemar Insurance Corp. of America v. Cox (In re Cox)*,[16] the Eleventh Circuit Court of Appeals joined the majority of circuits around the nation and adopted the *Brunner* test as its standard for determining undue hardship under § 523(a)(8).  In adopting the *Brunner* test, the Eleventh Circuit noted the Seventh Circuit Court of Appeals' observation in *In re Roberson*[17] that:

> The government is not twisting the arms of potential students. The decision of whether or not to borrow for a college education lies with the individual; absent an expression to the contrary, the government does not guarantee the student's future financial success. If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow.[18]

The Eleventh Circuit, considering the 1998 amendments to the Code (which left proof of undue hardship as the only method for relief), recognized that Congress's intent "was to make it harder for the student to shift his debt responsibility onto the taxpayer . . . ."[19]  The *Brunner* test, said the Eleventh Circuit, is the most effective tool for identifying those debtors whose income and circumstances would make it most unlikely that they could repay their student loan obligations while still maintaining a minimal standard of living.[20]  Under the *Brunner* test, the debtor bears the burden of proving each of the three prongs by a preponderance of the evidence.  Each of the three prongs or factors must be proven in order for this Court to find that an undue hardship exists, thus warranting discharge of the debt.

### A.  *Brunner Prong 1—Minimal Standard of Living*

---

[16] 338 F.3d 1238 (11th Cir. 2003).  In the case of *McGinnis v. Penn. Higher Educ. Assistance Agency*, 289 B.R. 257 (Bankr. M.D. Ga. 2003) (Laney, J.), this Court applied the *Brunner* test, just a few months prior to the Eleventh Circuit's adoption of the standard in *Cox*.

[17] 999 F.2d 1132 (7th Cir. 1993).

[18] *Cox*, 338 F.3d at 1242 (citing *In re Roberson*, 999 F.2d 1132, 1137 (7th Cir. 1993)).

[19] *Id.*

Under the first *Brunner* prong, Debtor must prove that she cannot maintain, based on current income and expenses, a *minimal* standard of living for herself and her dependent son if forced to repay her student loans. In order for the Court to apply this prong, the Court must determine what is a "minimal standard of living." The Court agrees with the Bankruptcy Court for the Northern District of Alabama that a minimal standard of living is a "measure of comfort, supported by a level of income, sufficient to pay the costs of specific items recognized by both subjective and objective criteria as basic necessities."[21] As in most student loan repayment situations, some level of sacrifice is required in order to stay current on payments. A debtor is not required, however, to sacrifice in such a degree that the debtor and/or the debtor's dependents are cast into an existence where some minimal standard of living cannot be obtained. In other words, a debtor is not required, under the undue hardship standard, to live in "abject poverty" in order to service a student loan debt.[22] The *Brunner* test strikes a proper balance by "safeguard[ing] the financial integrity of . . . student loan program[s] by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices."[23]

For purposes of applying the first prong of the *Brunner* test, the Court adopts the six specific elements necessary for a minimal standard of living in modern American society as enumerated by the bankruptcy court in *In re Ivory*:

> 1. People need **shelter**, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.

---

[20] *Id.*

[21] Ivory v. United States Dept. of Educ. (*In re* Ivory), 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001).

[22] Penn. Higher Educ. Assistance Agency v. Faish (*In re* Faish), 72 F.3d 298, 305 (3d Cir. 1995). *See Brunner*, 831 F.2d 395.

[23] *Faish*, 72 B.R. at 306.

2. People need **basic utilities** such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.

3. People need **food and personal hygiene products**. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.

4. People need **vehicles** to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

5. People must have **health insurance or have the ability to pay for medical and dental expenses** when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

6. People must have the ability to pay for some **small diversion or source of recreation**, even if it is just watching television or keeping a pet.[24]

As the finder of fact, the Court must apply its common sense knowledge gained from ordinary observations in daily life and general experience to determine whether Debtor's expenses are reasonable and necessary.[25]  If Debtor expends funds for items not necessary for the maintenance of a minimal standard of living or if Debtor expends too much for an item that is needed to maintain that minimal standard, then it is unlikely that, given Debtor's present circumstance, the first prong of the *Brunner* test is satisfied where such overpayment would permit Debtor to cover the expense of her student loan debt without sacrificing a minimal standard of living for her and her son.

---

[24] *Id.* (emphasis added).

[25] *Id.* (citing *Pacific Emp. Ins. Co. v. Orren,* 160 F.2d 1011 (5th Cir.1947); *Southern Shipyard Corp. v. The Tugboat Summitt,* 294 F. 284, 285 (4th Cir.1923); *Luna v. Luna,* 592 N.W.2d 557, 565 (N.D.1999); *Gross v. Connecticut Mut. Life Ins. Co.,* 361 N.W.2d 259, 269-270 (S.D.1985); *Kenney v. Rust,* 17 Mass. App. Ct. 699, 462 N.E.2d 333, 338 (1984), *review denied,* 391 Mass. 1106, 464 N.E.2d 73 (1984); *Richmond v. Richmond,* 340 Mass. 367, 164 N.E.2d 155, 157 (1960); *Mendoza v. Rudolf,* 140 Cal.App.2d 633, 295 P.2d 445, 447 (1956); *Johnson v. Snyder,* 99 Cal.App.2d 86, 221 P.2d 164, 167 (1950); *H.F. Wilcox Oil & Gas Co. v. Johnson,* 184 Okla. 198, 86 P.2d 51, 53 (1937); *Cary-Glendon Coal Co. v. Carmichael,* 258 Ky. 411, 80 S.W.2d 29, 31 (1935). *overruled in part on other grounds, Kentucky Mountain Coal Co. v. Hacker,* 412 S.W.2d 581 (Ky.1967); *Fitzgerald v. McDonald,* 81 Colo.

At trial, Debtor's unrefuted testimony was that her expenses had increased since the time she filed her original Schedule J.  The Court calculated that Debtor's actual monthly expenses (*i.e.*, those testified to at trial) totaled approximately $1,678.00, $346.00 more than Debtor's monthly net income of $1,332.00.  Debtor testified that her monthly expenses included $450.00 for rent, $85.00 for electricity, $30.00 for water/sewer, $34.00 for telephone service, and $48.00 for cable.  Debtor testified that she spends approximately $340.00 to $350.00 per month on food.  There have been occasions when Debtor has been unable to provide food for her and her son and she has been forced to borrow food from friends.  Debtor testified that she spent approximately $100.00 to $125.00 on clothing for her and her son and approximately $50.00 per month for dry cleaning.  According to Debtor's testimony, the money spent on clothing is spent purchasing items for Debtor's son and usually not for Debtor herself.  Debtor's monthly medical expenses total $300.00 or more each month, due in most part to Debtor's HIV condition and her having no health insurance.  Debtor has no automobile payment, but testifies that she spends approximately $140.00 per month on gas and maintenance for her 1991 Oldsmobile.  She spends only $43.00 per month to insure her vehicle.  Debtor states in her Schedule J that she spends nothing per month on recreation, charitable contributions, homeowner's or renter's insurance, life insurance, or health insurance.  Debtor's remaining expenses are $22.00 per month for her son's school lunches and $10.00 to $11.00 per month for her son's school related activities such as field trips and chorus.  Debtor has no money saved in order to pay for emergency expenses that may arise.

It is the finding of this Court that Debtor's budget, even at the higher amounts testified to at trial, is severely limited and bare.  What necessities the budget does provide for, it does so in very conservative amounts.  There are items that this Court considers necessary for a minimal standard of

413, 255 P. 989, 991 (1927)).

living that Debtor's budget does not make provision for—including health and renter's insurance and surpluses for under-budgeted or emergency expenses.  Further, Debtor's budgeted expenditures on behalf of her son and his care and education are minimal at best.  The limited nature of Debtor's budget is understandable considering that Debtor's income for 2005 only exceeded the national poverty level by approximately $540.00.  The expenses Debtor testified to are certainly reasonable.

By way of oral argument and through its post-trial brief, creditor ECMC suggests that while Debtor does not live a lavish lifestyle, she could afford to pay the $0.00 to $9.00 per month cost of servicing her student loan debt by eliminating the $48.00 per month cable television expense.  ECMC also states that the $0.00 to $9.00 per month payment would have virtually no effect on Debtor's standard of living.[26]  Although tempting, the Court cannot agree with ECMC's contentions.  It does appear at first glance that all debtors could afford to pay at least something toward their student loan debt, but that is not the standard for discharge.  The standard that the Code calls courts to consider is whether payment of the student loan would impose an undue hardship upon the debtor.  In the Eleventh Circuit, the first consideration is whether payment would prevent the debtor from maintaining a minimal standard of living.  With regard to the repayment of student loans, Congress has decided not to demand certain levels of sacrifice from debtors.[27]  The $48.00 Debtor expends each month to provide basic cable television and cable modem service to her home is an extremely reasonable price in the Court's experience.  This cable television service provides some small recreational benefit to Debtor and her son and the cable modem service provides an educational benefit to Debtor's son.  The Court does not believe that such a service, especially at the price it is obtained by Debtor, is inconsistent with a minimal standard of living.  Even if the Court were to rule,

---

[26] ECMC's Letter Brief at 3.

[27] *Ivory*, 269 B.R. at 912.

however, that the cable expense was unnecessary to maintain a minimal standard of living, Debtor's other necessary expenses still exceed her income by several hundred dollars even without the inclusion of the cable television and modem service expense.

The Court, therefore, concludes that Debtor's expenses as testified to at trial and as listed in Schedule J (*i.e.*, those amounts not amended by trial testimony) are reasonable and necessary for maintaining a minimal standard of living for Debtor and her son. Debtor's lifestyle is far from lavish and something less than minimal. Other than the expense for cable television and modem service, Debtor reports no spending for recreational items. Further, Debtor does not have a cellular telephone, a usual expense in our society, and Debtor's vehicle is a fifteen-year-old Oldsmobile on which she owes nothing. The Court finds that considering Debtor's current income and expenses, she does not maintain a minimal standard of living even without being required to service her student loan debt. Despite Debtor's extremely conservative lifestyle, a sizeable deficit exists each month between Debtor's income and her reasonable and necessary expenses, even without the addition of a student loan payment. The Court holds, therefore, that Debtor has carried the burden of proving, under the first prong of the *Brunner* test, that she cannot maintain, based upon her current income and expenses, a minimal standard of living for herself and her son if forced to repay her student loans, no matter how small the payment amount may be. Satisfaction of this prong is not dependent on the payment amount, but rather a determination by the Court of whether the debtor can maintain a minimal standard of living if being required to service the student loan.

B.  *Brunner Prong 2—Additional Circumstances*

The second prong of the *Brunner* test asks whether there are additional circumstances that exist suggesting that the debtor's state of affairs is likely to persist for a significant portion of the

20

repayment period of the student loan.  The state of affairs referred to in the second prong is the determination made in the first prong, *i.e.*, that the debtor cannot maintain, based upon current income and expenses, a minimal standard of living for herself and her dependents if required to repay her student loan.

Applying prong 2 "does not necessarily require future income predictions."[28]  Instead, prong 2 focuses on "the present existence of circumstances—circumstances *in addition to* a present lack of ability to pay—that strongly suggest an inability to pay the loan over an extended period of time . . . ."[29]  Simply stated, under prong 2, the debtor must prove by a preponderance of the evidence that her financial situation is not likely to improve.  The debtor is not required to prove that her financial situation will persist due only to a serious illness, psychological problem, disability, or other exceptional circumstance; other types of circumstances could apply as well.  In making its determination, a court should consider factors such as the debtor's age, age of the debtor's dependents, debtor's education, work and income history, physical and mental health, and other relevant circumstances.[30]  Satisfaction of prong 2 should be based upon a "certainty of hopelessness" into the future, "not simply a *present* inability to fulfill [a] financial commitment."[31]  A "'bleak forecast of the near future . . . [where] the debtor's straits are only temporary' is insufficient to demonstrate undue hardship under the second prong of *Brunner*."[32]  Meeting the standard set forth under prong 2 is not an easy task for a debtor.[33]

---

[28] Ulm v. Educ. Credit Mgmt. Corp. (*In re* Ulm), 304 B.R. 915, 921 (S.D. Ga. 2004).

[29] *Id.*

[30] *See Ulm*, 304 B.R. at 921; Educ. Credit Mgmt. Corp. v. Boykin (*In re* Boykin), 313 B.R. 516, 521 (M.D. Ga. 2004).

[31] Educ. Credit Mgmt. Corp. v. Carter (*In re* Carter), 279 B.R. 872, 877 (M.D. Ga. 2002) (citing *Roberson*, 999 F.2d at 1136) (emphasis added).

[32] *Id.* at 878 (citing *Roberson*, 999 F.2d at 1137).  In *Carter*, the District Court ruled that prong 2 of *Brunner* had not been satisfied since although the debtor was unemployed at the time, there were no impediments to her obtaining gainful employment in the future—the debtor suffered from no major disabilities, the debtor graduated with a

ECMC and the DOE ("creditors") argue that there is neither a "certainty of hopelessness" in Debtor's case, nor any unique or extraordinary circumstance that would cause Debtor to be unable to honor her student loan obligations into the future.[34]  According to the creditors, Debtor is young, intelligent, articulate, and holds a marketable college degree.[35]  The creditors recognize Debtor's allegation that her 1982 manslaughter conviction prevents her from obtaining work in a position that would allow her to repay her student loans.  The conviction, argue the creditors, should not be considered an "additional circumstance" because it existed long before Debtor incurred the student loan debt at issue.  In support of this proposition, ECMC cites in brief the case of *Thoms v. Educ. Credit Mgmt. Corp.*[36] from the Southern District of New York.

In *Thoms*, the debtor received student loans to obtain her bachelor's degree in psychology and her master's degree in social work.  The debtor earned approximately $48,000.00 per year with her net monthly income being $2,878.58.  The debtor's five-year-old son lived with debtor along with her thirteen-year-old sister and nine-year-old-brother.  The debtor received no child support from her son's father and had not attempted to compel a contribution.  The debtor was not the legal guardian of her siblings and received no financial contribution for her siblings' support.[37]

In its consideration of the second prong of the *Brunner* test, the court in *Thoms* stated that the debtor must show evidence of a continuing inability to repay her student loans over an extended

---

business degree and a 3.0 grade point average, the debtor had worked managing business records, the debtor had one year of accounting education, and the debtor's children (ages three and six) would soon grow old enough to attend school and therefore pose less of a financial burden.  The District Court held that with regards to a likely divorce in the future, the debtor had not carried her burden of proving how that event would prevent her from making her loan payments.  *Id*. at 878-79.

[33] *Id*. (citing *In re Mallinckrodt*, 274 B.R. 560, 567 (S.D. Fla. 2002)).

[34] ECMC Letter Brief at 4.

[35] *Id*.

[36] 257 B.R. 144 (S.D.N.Y. 2001).

[37] *Id*. at 147.

period of time, marked by additional, exceptional circumstances.[38]  The court said that the type of

"additional circumstance" contemplated was a "circumstance that impacted on the debtor's future

earning potential *but which was either not present when the debtor applied for the loans or has since*

*been exacerbated*."[39]  The court reasoned that otherwise, "the debtor could have calculated that

factor into [her] cost-benefit analysis at the time [she] obtained the loan."[40]  As examples of this type

of additional circumstance, the court listed the debtor's experiencing an illness, developing a

disability, or becoming responsible for a large number of dependents after receiving the loan.[41]  In

*Thoms*, the court held that the second prong of *Brunner* had not been satisfied since the debtor's

financial situation was likely to improve, there was a surplus in the debtor's budget, and certain

expenses were to be eliminated in the near future.[42]

Here, the evidence relevant to a determination under prong 2 of *Brunner* is as follows:

Debtor was 45 years old at the time of the trial and Debtor's son was 9 years old.  Debtor's income is

insufficient to support a minimal standard of living for her and her son and such has been the case

since at least 1999, the earliest year that evidence of income was submitted.  The evidence strongly

suggests that the financial distress Debtor is currently suffering will continue into the future.

Although Debtor has earned a bachelor's degree in early childhood education, it was the

unchallenged testimony of Debtor that she has been refused employment in the field of teaching,

despite her certification, by two school systems in her area and by the Georgia prison system.  It was

also the unchallenged testimony of Debtor that when she inquired why she was not being hired, she

---

[38] *Id*. at 148.

[39] *Id*. at 149.

[40] *Id*.

[41] *Id*.

[42] *Id*. at 149-50.

was told that her manslaughter conviction made her too much of a liability.  Although Debtor did at

one time work as a substitute teacher, her testimony was that she can no longer work as a substitute

teacher because of her criminal conviction and changes in the hiring standard.  The Court finds

Debtor's testimony credible that she was unable to find a position in her field of expertise because of

her past criminal conviction.

Because of her criminal background, it is apparent from the evidence that Debtor has been

forced to settle for lower-paying positions such as retail service work and the position of motel

receptionist in which she is currently employed.  Due to back surgery, Debtor was forced to resign

her position in retail for a position that did not require extended periods of standing.  Debtor's

options, in the way of quality, well-paying positions, are severely limited.

Debtor testified, and it was not challenged, that she was never informed, prior to pursuing her

degree in early childhood education, that her criminal conviction would be a hindrance to her finding

a position as a teacher.  Although this is understandable, considering that it appears no Georgia

statute or regulation prohibits an individual previously convicted of a felony from being employed as

a teacher, Debtor pursued her degree with the reasonable expectation that she would be able to find

employment in her chosen field.  The Court accepts the unrefuted testimony of Debtor that finding a

quality job outside the realm of teaching is more difficult because of her criminal conviction.  Debtor

testified that she allowed her teacher certification to lapse in 1999 because her experience convinced

her that she would not be able to find a position due to her criminal conviction.  In May of 2006,

Debtor reapplied for certification and at the time of trial, she had received no response.  Debtor's

unchallenged testimony was that she had been told regarding her application that all of the details

surrounding her conviction would have to be investigated.  Despite Debtor's application for

certification, the Court is persuaded by Debtor's testimony of her past experience, that even if the certificate is reissued, Debtor will probably not be hired as a teacher.  The Court cannot, of course, be certain of this, but the Court considers truthful Debtor's testimony that she was told by various school systems that she could not be hired in the area of early childhood education because of the liability her conviction would create.

Debtor's situation is further complicated and worsened by her 1997 diagnosis that she had contracted HIV.  In the past, her condition has worsened to AIDS, but later downgraded back to HIV as Debtor began a medicinal regimen.  Common knowledge of the illness indicates that it is degenerative in nature.  Relevant, however, is the evidence presented that Debtor's condition requires that she undergo testing every quarter, which costs approximately $770.00.  Also, Debtor is required to take medication to treat her condition.  Debtor testified that the medication leaves her feeling fatigued.  Debtor does receive the benefit of a drug program, which assists in the purchase of her medications, but Debtor does not have the benefit of health insurance and is, therefore, personally responsible for the expenses related to her quarterly testing.  Although the Court does not rest its determination under prong 2 on Debtor's illness, it is necessary to consider Debtor's medical condition, the costs associated with that condition, and the current effects of the condition, as factors in determining whether her financial distress is likely to persist.

The Court concurs with the creditors that Debtor appears to be intelligent and articulate. However, the Court disagrees with ECMC and the DOE that Debtor has a marketable college degree. Although Debtor does have a college degree, the evidence in this matter is clear that, because of her criminal conviction, Debtor's degree has not been marketable.  The Court agrees that a college degree is in itself generally marketable, but the evidence in this case supports a finding that any

benefit Debtor would otherwise receive from the degree has been cancelled by the plague of her past conviction.

Regarding the *Thoms* standard for "additional circumstance" suggested by the creditors, the Court first notes that the standard is not mandatorily applicable in this district or circuit, but the Court recognizes the general usefulness of the standard in considering prong 2 of *Brunner*. Applying the *Thoms* standard, the Court concludes that Debtor's health condition, both her back problems and her HIV diagnosis, post-dated the student loans in question and therefore qualify as additional circumstances under *Thoms*. As to Debtor's criminal conviction, the Court believes that although the "condition" of her conviction preexisted her student loan debt, the effect of that condition was exacerbated by Debtor's attempts to find employment in the field of early childhood education. Debtor's testimony was that she had not received any warning that her criminal background would negatively affect her being able to find a position as a teacher. It would be difficult, therefore, for Debtor to have taken her criminal background into account when conducting the cost-benefit analysis discussed in *Thoms*.

Debtor has been hindered greatly by her criminal conviction, somewhat by her back injury and surgery, and in some degree by her serious medical condition. Debtor has been stuck in the poverty range since 1999 and there appears to be no promise of that situation improving. Time will certainly not remove Debtor's criminal conviction, nor will Debtor's physical condition improve with time. The only reasonable conclusion that can be reached from the evidence presented is that Debtor is in dire straights financially and, because of the additional circumstances identified above, Debtor is most likely to remain there from this time forward. This being so, the Court holds that Debtor has satisfied her burden of proving, by a preponderance of the evidence, that additional

circumstances exist suggesting that Debtor's state of affairs is likely to persist for a significant

portion of the repayment period of the student loan. Debtor has thus satisfied prong 2 of the *Brunner*

test.

### C.   Brunner Prong 3—Good Faith

"With the receipt of a government-guaranteed education, the student assumes an obligation to

make a good faith effort to repay those loans, as measured by his or her efforts to obtain

employment, maximize income, and minimize expenses."[43]  Satisfaction of this third prong of the

*Brunner* test requires a showing that the debtor made efforts "to satisfy the debt by all means—or at

least by *some* means—within the debtor's reasonable control."[44]  A lack of bad faith is not the

applicable test for deciding the third prong of *Brunner*.[45]  Actual payments are not required to prove

good faith.[46]  The debtor is tasked with proving that either a good faith effort was undertaken to

repay the student loans or "that the forces preventing repayment [were] truly beyond his or her

reasonable control."[47]  "Since a debtor's good faith is interpreted in light of his ability to pay, a

complete failure to make even minimal payments on a student loan does not prevent a finding of

good faith where the debtor never had the resources to make payments."[48]  The "good faith" prong of

*Brunner* has been described as:

> a moving target that must be tested in light of the particular
> circumstances of the party under review . . . . [T]he characterization
> of that effort must reflect not only a party's objective conduct, but
> also the environment in which that conduct occurs. In those instances
> in which the debtor cannot maintain a minimal standard of living

---

[43] *Roberson,* 999 F.2d at 1136 (citation omitted); *In re* Wallace, 259 B.R. 170 (C.D. Cal. 2000).

[44] *Ulm*, 304 B.R. at 922.

[45] *Id.*

[46] *McGinnis*, 289 B.R. at 267 (citing *In re Mallinckrodt*, 274 B.R. at 568).

[47] *Brunner*, 46 B.R. at 755; *see Wallace*, 259 B.R. at 183 (citing *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265 (Bankr. E.D.N.Y. 1998)).

[48] *Lebovits*, 223 B.R. at 274.

27

> even without payment of student loans, the demonstration of good
> faith does not necessarily command a history of payment. It does
> require a history of effort to achieve repayment, such as when a
> borrower diligently uses a deferment period to attempt the
> reorganization of her financial affairs.[49]

At issue with regard to this third prong are the creditors' contentions that Debtor cannot be

found to have made good faith efforts to repay her student loans since Debtor made only nominal

payments towards her loans and because Debtor failed to avail herself of the Income Contingent

Repayment Plan ("ICRP") or some other repayment option available under the Ford Program. As to

the general requirement of proof under this "good faith" prong of *Brunner*—that good faith is

demonstrated by a debtor's efforts to maintain employment, maximize income, and minimize

expenses—the evidence and conclusions of the Court are as follows. The evidence shows that

Debtor has been steadily employed since 1999, other than for a eight to nine month period of

unemployment following back surgery. Debtor has worked at her current position with the Quality

Inn since 2003. There is no evidence that Debtor has worked a forty-hour per week schedule, but

Debtor explains that added childcare costs would not justify additional hours. Debtor currently

works approximately 32 hours per week.

Debtor testified that she has been unable to find quality, higher paying positions due to her

criminal background. As mentioned above, Debtor testified that she applied for employment as a

teacher with two school systems and the Georgia prison system but was told she could not be hired

because of the liability she posed due to her criminal conviction. After being told that she could not

be hired as a teacher by the two school systems and the prison system, it was reasonable that Debtor

did not apply for other teaching positions and turned her efforts toward finding some other type of

---

[49] *Wallace*, 259 B.R. at 184 (citing *Maulin v. SallieMae (In re Maulin)*, 190 B.R. 153, 156 (Bankr. W.D.N.Y. 1995)).

position instead.  It is the Court's finding that considering the negative effect Debtor's criminal

conviction has on her ability to find quality, higher paying positions, Debtor has obtained

employment and remained employed and has maximized her income under the circumstances she is

faced with.  The Court is certain that if the opportunity to work as a teacher had not been foreclosed,

Debtor's financial position would be improved.  Referring back to the Court's discussion under the

first prong of *Brunner*, it is clear from Debtor's budget and expenses that Debtor has minimized her

expenses.

As to the creditors' first contention that there was no good faith effort to repay since Debtor

made few payments on her loans, the evidence is clear that Debtor has made very few *voluntary*

payments toward her ECMC loans and no *voluntary* payments toward her DOE loans.  Over

$4,000.00 has been paid *involuntarily*, however, toward the DOE loans by way of two wage

garnishments and several federal income tax refund set-offs.  Debtor testified that she filed her

federal income tax returns knowing that she would be due a refund and knowing that the DOE would

seize the refund.  Debtor stated that filing her returns knowing that the refunds would be seized was

her way of paying something toward her student loan debt being as she could not otherwise afford to

make payments.

As mentioned above, "the demonstration of good faith does not necessarily command a

history of payment" but "does require a history of effort to achieve repayment."[50] Here, the evidence

is that Debtor has not been able to make payments on her student loans while maintaining a minimal

standard of living for her and her son.  The Court will not, therefore, find that Debtor did not make a

good faith effort to repay simply because only nominal voluntary payments were made to ECMC.

---

[50] *Id*. (citing *Maulin*, 190 B.R. at 156).

Although the fact that Debtor made only nominal payments is an important factor in determining whether Debtor made a good faith effort to repay, other evidence should be considered in this case.

ECMC and the DOE also argue against a determination of "good faith" based upon Debtor's failure to research and avail herself of the various repayment options available under the Ford Program.  As discussed above, under the Ford Program, qualifying borrowers can repay their student loans under one of four repayment options.  Under the ICRP, one of the four repayment options, the monthly payment is calculated based upon the borrower's adjusted gross income and family size.  The specifics of the payment calculation are set forth above, but relevant to this discussion is the parties' stipulation that based upon Debtor's adjusted gross income and family size, the monthly payment on her student loans would be somewhere between $0.00 and $9.00.  Even after the presentation of evidence, the Court is still unable to determine exactly what the monthly payment would be.

It was the testimony of Debtor that she did not learn of the Ford Program or of the ICRP until after her bankruptcy case had been filed and the instant action commenced.  Debtor stated that she was made aware of each through a letter sent by counsel for ECMC.  The evidence shows that Debtor's only attempt to explore repayment options was after a wage garnishment was initiated, when Debtor contacted the listed garnishor and inquired into other repayment options.  Debtor's unchallenged testimony was that she was told there was no other repayment option other than the payment of 20-25% of Debtor's monthly gross income, which Debtor testified she could not afford.

In its brief, ECMC cites various cases in support of its position that the failure of a debtor to avail herself of the repayment options available militates against the finding of a good faith effort to repay.  The Court agrees that in many situations that is indeed true.  One of the primary cases cited

by ECMC was *U.S. Dept. of Educ. v. Wallace (In re Wallace)*.[51]   In *Wallace*, the debtor had paid his

loans for several years while working as an attorney.  When the debtor was unable to pay, he sought

and obtained deferments.  The debtor also made an $8,000.00 lump sum payment on his loans. The

court in *Wallace* stated that these facts indicated an *earlier* good faith effort to repay.  The real issue

in *Wallace*, with regard to the "good faith" prong of *Brunner*, was whether the debtor continued in

his good faith efforts to repay after he initiated the adversary proceeding seeking discharge of his

student loan debts.  The court in *Wallace* explained that "[a] debtor's good faith can be measured by

evaluating how he responded to repayment opportunities that were presented to him."[52]

In *Wallace*, the debtor reviewed literature describing the various repayment options, but

concluded that under the ICRP, his payment would be $390.00 per month.  The court stated that

"[b]ecause he could not afford payments of such magnitude, he *reasonably* did not pursue the

'income contingent' plan."[53]   The debtor was later informed by counsel for one of his student loan

creditors that his payments could be as low as $369.00 per month under the ICRP.  The debtor

testified that he did not choose to participate in the ICRP at that point because his disposable income

was less than $100.00 per month and even under the ICRP, payment would have caused his standard

of living to fall well below the minimal standard of living.[54]   The debtor advised his creditor's

counsel of that fact.[55]   At a later hearing, counsel for the same creditor represented to the debtor that

he had the further option of applying under a "special circumstances" regulation.  The hearing was

continued to allow the debtor to explore and/or apply for such a repayment option, but there was no

evidence the debtor ever did.  Again, at a subsequent hearing, the counsel for the creditor made

---

[51] *Wallace*, 259 B.R. 170.

[52] *Id*. at 184.

[53] *Id*. at 184 (emphasis added).

[54] *Id*.

31

another concession, which would allow the debtor's payment of $369.00 per month to be apportioned between it and Hemar, another student loan creditor.  The result would be that the debtor would make one payment, rather than the $369.00 payment plus another payment to Hemar.  There was no indication that Hemar would accept the proposal, however.  There was no evidence that the debtor contacted Hemar or attempted any further negotiations with the creditors.[56]  Although the court in *Wallace* concluded that it *appeared* the debtor ceased his good faith efforts to repay after the filing of the adversary proceeding when he failed to apply for or inquire about the alternate repayment options offered by the creditor's counsel, the court nonetheless remanded the issue to the bankruptcy court for further development of the record regarding whether the debtor's good faith efforts continued.[57]

Here, Debtor inquired into other repayment options when she contacted the garnishor.  It was the undisputed testimony of Debtor that she was told there were no options other than paying 20-25% of her monthly gross income.  Considering the discussion above regarding Debtor's budget, Debtor, like the debtor in *Wallace*, *reasonably* concluded that she could not afford such a payment and filed for bankruptcy protection.  The rule from *Wallace* that good faith efforts to repay should continue after the case filing and even after the filing of an adversary proceeding on dischargeability of the student loans, is a sound and reasonable rule.  The facts in the case at bar are distinguishable from those in *Wallace*, however.  Here, the evidence is that Debtor learned of the ICRP by a letter from counsel for ECMC sent to Debtor's counsel after the commencement of this adversary proceeding.  The evidence is that Debtor failed to apply for participation in the ICRP.  Again, like in

---

[55] *Id.*

[56] *Id.*

[57] *Id.* at 186.

*Wallace*, Debtor's inaction was reasonable given her inability to afford any payment toward her student loans at the time the offer of the ICRP was made. The ability of a debtor to pay should be a primary factor considered by courts in determining whether a debtor made a good faith effort to repay.

Considering Debtor's financial distress and the actions that she did take to repay her student loans and to inquire into alternative payment solutions, the Court finds that Debtor has satisfied her burden under prong 3 of *Brunner*. Debtor's financial situation is grave and the prospects of that situation improving are non-existent. Debtor's activity with regard to her student loans must be considered within the context of this larger situation. The Court finds it reasonable that after being told by the garnishor that the only repayment option was to pay 20-25% of her monthly gross income that Debtor considered her chances of finding a suitable repayment option hopeless. The Court also finds it reasonable that after being notified by ECMC's counsel that the ICRP was an available option that Debtor took no action considering her inability to afford even a minimal standard of living for her and her son.

## **CONCLUSION**

This is a very difficult case for the Court, as most cases concerning the discharge of student debt are. The heightened standard for discharging student loans is absolutely necessary to prevent abuses of the educational loan system and to safeguard the financial integrity of that system in order to preserve its benefits for future students who will rely on the system as the means for obtaining a college education. The discharge of student loans is reserved for those most extreme instances of financial destitution. It is the Court's finding that this debtor finds herself in such a situation.

For the reasons stated above, the Court holds that Debtor has carried her burden of proving, under the standard set forth in *In re Brunner* and adopted by the Eleventh Circuit Court of Appeals in *In re Cox*, that excepting Debtor's student loan debt from discharge would impose an undue hardship on Debtor and her dependent son.  As such, the student loan debt at issue, representing loans made by ECMC and the DOE, is held to be dischargeable.